Eunice M. LAFATE, Plaintiff,

v.

CHASE MANHATTAN BANK (USA), a Delaware corporation, Defendant.

No. Civ.A. 96–575–JJF.

United States District Court,
D. Delaware.

Nov. 1, 2000.

James J. Maron, David E. Wilks, Maron,
Marvel & Wilks, P.A., Wilmington, DE, for
Plaintiff.

Barry M. Willoughby, William W. Bowser, Jan R. Jurden, Drewry Nash Fennell, Young, Conaway, Stargatt & Taylor, LLP, Wilmington, DE, for Defendant.

## MEMORANDUM OPINION

FARNAN, District Judge.

Presently pending before the Court is the Defendant's Motion for Judgment as a Matter of Law, New Trial and Amendment of the Verdict (D.I.214). For the reasons set forth below, the Court will deny the Defendant's motion in part, and grant the Defendant's motion in part.

## BACKGROUND

The Plaintiff, a 53 year old female born in Jamaica, began working for the Defendant in 1985 as a Credit Correspondent. During her employment with the Defendant, the Plaintiff was promoted several times and received ratings of 1 or 2 on a 5 point scale on her annual performance review.[1] By 1992, the Plaintiff was the Credit Supervisor in the New Underwriting area of the Credit Department. In 1994, the Plaintiff's position was upgraded by the Defendant to a Level 06 based on an evaluation by her supervisor at the time, Edward Matthews.

In May 1994, the Plaintiff applied and interviewed for the position of a Level 08 Compliance Officer upon the recommendation of Matthews. (D.I. 124 at 3). Even though the Plaintiff received an initial interview and second interview, the Plaintiff was not offered the position. (D.I. 124 at 3). In November 1994, the Plaintiff applied for the position of a Level 07 Regulatory Compliance Officer. (D.I. 124 at 3). On December 1, 1994, the Plaintiff was denied the position, without an interview, by David Blank, Vice-President of the Defendant's Legal Department. (D.I. 124 at 3).

Upon receiving this notice, the Plaintiff asked Blank why she was not granted an interview. (D.I. 124 at 3). Blank asked the Plaintiff about her latest performance evaluation. (D.I. 124 at 3). The Plaintiff informed Blank that she had received a "1—outstanding." (D.I. 124 at 3). Blank replied that he had received different information upon speaking with Matthews. (D.I. 124 at 3).

On December 27, 1994, the Defendant provided the Plaintiff with her performance evaluation which stated that she received a "3—fully satisfactory," and criticized her verbal communication skills. (D.I. 124 at 3). On December 29, 1994, the Plaintiff contacted the Defendant's Human Resources Office and requested copies of her 1992 and 1993 reviews. (D.I. 124 at 3). Later that morning, Blank contacted the Plaintiff for an interview for the Level 07 position. (D.I. 124 at 3–4). The Plaintiff and Blank initially agreed to meet on January 3, 1995; however, Blank later insisted on meeting with the Plaintiff that same day. (D.I. 124 at 4). The Plaintiff met with Blank and Helen Stewart, and in January 1995, the Defendant informed the Plaintiff that the Level 07 position was offered to another candidate. (D.I. 124 at 4).

In February 1995, the Plaintiff filed a charge of race and age discrimination against the Defendant with the Delaware Department of Labor ("DDOL") and the Equal Employment Opportunity Commission ("EEOC"). (D.I. 124 at 4). The DDOL found reasonable cause to believe that the Defendant engaged in unlawful employment practices. (D.I. 124 at 4). In August 1996, the EEOC issued a right to sue letter to the Plaintiff. (D.I. 124 at 4).

The Plaintiff subsequently filed the instant suit on November 26, 1996, alleging violations of the Age Discrimination in

---

1. Employee evaluations are based on a 5 point scale:
 1—outstanding
 2—commendable
 3—fully satisfactory
 4—needs improvement
 5—unsatisfactory. (D.I. 124 at 2).

Employment Act of 1967, 29 U.S.C. § 621 et seq. ("ADEA"), Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. ("Title VII"), and 42 U.S.C. §§ 1981 and 1981 a ("Section 1981"), and of the covenant of good faith and fair dealing under Delaware state law. (D.I. 124 at 1). In addition to the allegations contained in the complaint filed with the DDOL and EEOC, Count IV of the Second Amended Complaint in this lawsuit also alleged that the Defendant responded to the charges of age and race discrimination by engaging in a course of conduct intending to retaliate against the Plaintiff for filing the original discrimination charges, in violation of Title VII and Section 1981. (D.I. 124 at 7). In Count V, the Plaintiff asserted a related claim, alleging that the retaliation taken by the Defendant amounted to a Constructive Discharge from her employment. (D.I. 124 at 7). On July 14, 1999, the Court granted the Defendant's motion for summary judgment on the Plaintiff's ADEA and state law claims, but denied the motion as to the Title VII and Section 1981 claims. (D.I.130).

The case was tried before a jury on November 15, 17, and 18, 1999. The jury returned a verdict on November 19, finding in favor of the Defendant on the Plaintiff's discriminatory promotion and constructive discharge claims. The jury found in favor of the Plaintiff on her retaliation claim and awarded her $100,000 in compensatory damages and $500,000 in punitive damages.

## DISCUSSION

## I. DEFENDANT'S MOTION FOR JUDGMENT AS A MATTER OF LAW

### A. Title VII Retaliation Claim

The Defendant asserts that it is entitled to a judgment as a matter of law because: (1) the Plaintiff failed to establish a *prima facie* case of retaliation, (2) the Plaintiff did not show that the Defendant's reasons for its actions were a pretext for retalia-

tion, and (3) the Plaintiff's failure to complain bars her retaliation claim. The Court will address each argument in succession.

Under Rule 50 of the Federal Rules of Civil Procedure, a court should grant a judgment as a matter of law only "where there is no legally sufficient basis for a reasonable jury to have found for the non-moving party." *Price v. Delaware Dept. of Correction*, 40 F.Supp.2d 544, 549 (D.Del. 1999); FED.R.CIV.P. 50. When considering a post-verdict motion for judgment as a matter of law under Rule 50(b), the court "must view the evidence in the light most favorable to the non-moving party." *Id.* (quoting *Keith v. Truck Stops Corp. of Am.*, 909 F.2d 743, 745 (3d Cir.1990)). The non-moving party is entitled to "all logical inferences" that can be drawn from the evidence. *Id.* (quoting *Williamson v. Consolidated Rail Corp.*, 926 F.2d 1344, 1348 (3d Cir.1991)). Although more than a "mere scintilla of evidence" is required to uphold the jury verdict, the court should only overturn the verdict if it is "so unreasonable" that the movant is entitled to a judgment as a matter of law. *Joy Technologies, Inc. v. Flakt, Inc.*, 820 F.Supp. 802, 805 (D.Del.1993), *aff'd*, 60 F.3d 843 (Fed.Cir.1995).

### 1. The Plaintiff has Established a *Prima Facie* Case of Retaliation

To establish a *prima facie* case for a Title VII retaliation claim, a plaintiff must show: "(1) protected employee activity; (2) adverse action by the employer either after or contemporaneous with the employee's protected activity; and (3) a causal connection between the employee's protected activity and the employer's adverse action." *Krouse v. American Sterilizer Co.*, 126 F.3d 494, 500 (3d Cir.1997) (citing *Woodson v. Scott Paper Co.*, 109 F.3d 913, 920 (3d Cir.1997)). The parties do not dispute that the Plaintiff was involved in employee activity that is protected under Title VII. The Defendant does dispute that it engaged in "adverse em-

ployment action" and that the Plaintiff successfully established a causal link between the protected employee activity and the alleged "adverse employment action."

### a. Adverse Employment Action

■ Retaliatory conduct constitutes "adverse employment action" under Title VII only if it "alters the employee's 'compensation, terms, conditions, or privileges of employment,' deprives him or her of 'employment opportunities,' or 'adversely affect[s] his [or her] status as an employee.'" *Robinson v. City of Pittsburgh*, 120 F.3d 1286, 1300 (3d Cir.1997). Consequently, " 'not everything that makes an employee unhappy' qualifies as retaliation, for '[o]therwise, minor and even trivial employment actions that an irritable, chip-on-the-shoulder employee did not like would form the basis of a [retaliation claim].'" *Id.* (quoting *Smart v. Ball State Univ.*, 89 F.3d 437, 441 (7th Cir.1996)). Job termination, however, is not a requirement for a finding of adverse employment action— less severe action can suffice. *Kim v. Nash Finch Co.*, 123 F.3d 1046, 1060 (8th Cir.1997).

The Defendant asserts that the actions it took do not amount to adverse employment action. The Defendant argues that the individual acts the Plaintiff complains about have been held by courts not to constitute adverse employment action. *See Robinson*, 120 F.3d at 1297 (holding that isolation and lack of respect from fellow managers and co-workers did not amount to adverse employment action); *Crawley v. Runyon*, 1998 WL 355529 (E.D.Pa. June 30, 1998) (having employee followed into the bathroom was not adverse employment action); *Clary v. Marley Cooling Tower Co.*, 1997 WL 150048 (D.Kan. Mar. 12, 1997) (transfer to inferior cubicle does not amount to adverse employment action). These cases, however, all involved situations where there was one alleged retaliatory act, or a couple isolated instances. The Third Circuit has recently emphasized that courts should not analyze the employer's individual acts in isolation, but should analyze all of the acts collectively in deciding whether there has been adverse employment action. *Shaner v. Synthes (USA)*, 204 F.3d 494, 503 n. 9 (3d Cir.2000). For instance, in *Kim*, the court held that: "as a matter of law, [the defendant's] conduct, which included reduction of duties, disciplinary action and negative personnel reports, as well as required remedial training, constituted adverse employment action." 123 F.3d at 1060. The Third Circuit has further held:

> [t]o move [the Plaintiff] from work she had done satisfactorily for over two years to work she was unable to do was an employment action that a reasonable jury could find adverse. The facts that her pay and benefits were not reduced and that [the defendant] considered the jobs equivalent are not dispositive.

*DiIenno v. Goodwill Industries of Mid-Eastern Pa.*, 162 F.3d 235, 236 (3d Cir. 1998). Courts have also declared that moving employees from their existing laboratory in the middle of an ongoing research project to a less desirable and insufficient location constituted adverse employment action. *Chuang v. University of Cal. Davis, Bd. of Trustees*, No. 99–15036, 2000 WL 1224780, at *7 (9th Cir. Aug.30, 2000). *See also Wyatt v. City of Boston*, 35 F.3d 13, 15–16 (1st Cir.1994) (per curiam) ("toleration of harassment by other employees amounts to adverse employment action").

■ In the present case, the Plaintiff produced evidence regarding a number of alleged retaliatory acts. In viewing all of these actions collectively, the Court finds that sufficient evidence exists for a finding of adverse employment action. First, the Plaintiff testified that her fellow managers "isolated" her and would refuse to acknowledge her, and that her subordinates resisted her authority. (D.I. 208 at A–85/7–22). Second, the Plaintiff was switched to an inferior "cubicle" that was out in the open in the middle of the aisle, without any of the furnishings that her co-

workers had. (D.I. 208 at A–84/16–21). Third, the woman who received the promotion over the Plaintiff (that was the impetus for the original discrimination claim) was placed immediately across from the Plaintiff's space so that the Plaintiff believed she could be monitored more easily. (D.I. 208 at A–84/22 – A–85/1; A–86/17–18).[2] Fourth, the Plaintiff testified that upon returning from a brief vacation, she learned that she had been assigned to conduct an audit that she had never been trained to perform. (D.I. 208 at A–92/19–22). Her co-workers who were assigned to the audit with her had gone through an auditing training school, leaving her feeling ill-equipped for the job. (D.I. 208 at A–92/23 – A–93/7). Fifth, there is evidence of several instances in which the Plaintiff's direct supervisor at the time, Mr. Rossiter, belittled the Plaintiff in front of her peers for mistakes that she never actually made. (D.I. 208 at A–87/15 – A–88/20). Last and most importantly, confidential reports containing details of the Plaintiff's original charges of discrimination against the Defendant were placed in the Plaintiff's personnel file and had been seen by four of the Defendant's managers. (D.I. 208 at A–89/22 – A–90/18).

Considering all of these acts in a light most favorable to the Plaintiff, and drawing all inferences in her favor, the Court finds that sufficient evidence exists to support the jury's finding that the Defendant had taken adverse employment action against the Plaintiff.

b. Causal Link

The Defendant also claims that the Plaintiff has failed to establish the final prong of a *prima facie* case of retaliation: that the alleged adverse employment action was causally connected to the Plaintiff's protected activity of filing the original discrimination claim. (D.I. 217 at 17).

The Third Circuit has stated that: "temporal proximity between the protected activity and the [adverse employment action] is sufficient to establish a causal link. We have also held that the 'mere passage of time is not legally conclusive proof against retaliation.'" *Woodson v. Scott Paper Co.,* 109 F.3d 913, 920 (3d Cir.1997) (citations omitted). It is true that some cases subsequent to *Woodson* have limited this holding. *See, e.g., Robinson v. City of Pittsburgh,* 120 F.3d 1286, 1302 (3d Cir.1997) (suggesting that timing alone can be deemed sufficient for establishing a causal connection only if the facts are "unusually suggestive" of retaliation). This means that the analysis is highly fact sensitive, and that whether temporal proximity between the protected activity and the retaliatory conduct by itself can sufficiently establish the causal connection depends on "how proximate the events actually were, and the context in which the issue [arose]." *Farrell v. Planters Lifesavers Co.,* 206 F.3d 271, 279 (3d Cir.2000). In addition to timing, evidence of "intervening antagonism or retaliatory animus," or other circumstantial evidence can also allow an inference of causation. *Id.* at 280. In sum, the case law has "set forth no limits on what [courts can] consider" in determining causation. *Id.* at 281.

Courts are quick to draw an inference of causation when the alleged retaliation occurs only a short time after the employer received notice of the employee's protected activity. *See Jalil v. Avdel Corp.,* 873 F.2d 701, 708 (3d Cir.1989) (holding that two days between notice of the protected activity and the retaliation led to an inference of causation); *Krouse v. American Sterilizer Co.,* 126 F.3d 494, 503–04 (3d Cir. 1997) (concluding that 19 months between the alleged retaliation and the protected activity was too great a passage of time to draw an inference of causation without other evidence of causation).

**2.** The Defendant cites *Clary v. Marley Cooling Tower,* 1997 WL 150048 (D.Kan. Mar. 12, 1997) to support the proposition that being moved to an undesirable cubicle does not amount to adverse employment action. (D.I. 217 at 16). In the present case, however, the Plaintiff's office space relocation was only a small part of the conduct at issue.

■ In the present case, the Plaintiff filed her original discrimination claim with the DDOL and EEOC in February of 1995. The Plaintiff testified that the retaliation started almost immediately after filing the original discrimination charge:

> It started going back to February, after February 1995. When I filed the—the atmosphere became very hostile, starting with people isolating me, starting with the peers that I used to go to lunch with totally shying away from me. Never wanting to be seen with me. It started with managers snubbing me. I went to meetings and said "Good Morning," people didn't respond to me . . . .

(D.I. 208 at A–85/8–14). Her testimony stated that the retaliation continued long after this initial isolation: "[a]nd the hostility continued, and it was compounded. It went from bad to worse, in November of 1996 . . . ." (D.I. 208 at A–86/18–20). The Defendant argues that because most of the more specific allegations of retaliation occurred over a year after the original discrimination charge was filed, the passage of time prohibits a finding of causation. The passage of time, however, is not conclusive of lack of causation when, as in this case, no evidence exists as to when the responsible individuals learned of the discrimination charge. The record shows that confidential reports regarding the original discrimination claim were contained in the Plaintiff's personnel file and that four managers had seen that file since the Plaintiff originally filed the discrimination charge. (D.I. 208 at A–89/22 – A–90/18). It is unclear when anybody actually saw her file, but the mere fact that the confidential reports were contained in the personnel file amounts to "unusually suggestive" circumstantial evidence. The delay in the more specific and egregious claims of retaliation could be explained by the fact that it took some time for the rumors of the Plaintiff's discrimination charge to reach all of the people responsible for the retaliation. As a result, these facts are sufficient to uphold the jury's conclusion that a causal connection existed between the protected activity of filing the discrimination charge and the retaliatory conduct.

**2. The Defendant's Reasons for its Actions were Shown to be a Pretext for Retaliation**

The Defendant asserts that, even if the Plaintiff has established a *prima facie* case of retaliation, the Defendant has articulated non-discriminatory reasons for the conduct at issue and the Plaintiff has failed to present evidence that would suggest that these reasons were a mere pretext for retaliation. (D.I. 217 at 21). The Defendant therefore argues that it is entitled to a judgment as a matter of law. However, the Defendant misconstrues the *McDonnell–Douglas* framework in so arguing. Under *McDonnell Douglas,* a plaintiff must first establish a prima facie case of retaliation. *See St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 506, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). If the plaintiff succeeds in establishing a *prima facie* case, a rebuttable presumption that the defendant engaged in the alleged retaliation arises, and the defendant must then produce evidence of some legitimate non-retaliatory reason for its actions. *See id.* at 510, 113 S.Ct. 2742. If the defendant does so, the presumptions drop out of the analysis altogether. *See id.* In fact, the Supreme Court has expressly stated that even when the defendant articulates a legitimate explanation for its conduct:

> The factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the *prima facie* case, suffice to show intentional [retaliation]. Thus, rejection of the defendant's proffered reasons will permit the trier of fact to infer the ultimate fact of intentional [retaliation] . . . [and] upon such rejection, "[n]o additional proof of [retaliation] is required."

*Id.* at 511, 113 S.Ct. 2742.

This language clearly refutes the Defendant's assertion that the Plaintiff need

come forward with evidence that rebuts the Defendant's proffered explanation. Rather, the jury is free to reject the Defendant's explanation and conclude from the Plaintiff's evidence that established the *prima facie* case alone, that the Defendant did retaliate against the Plaintiff. *See Smith v. Borough of Wilkinsburg*, 147 F.3d 272, 280 (3d Cir.1998). As a result, the Defendant's argument is not persuasive.

### 3. The Plaintiff is not Required to Complain About the Retaliatory Conduct

The Defendant next argues that the Plaintiff failed to complain about the alleged retaliatory conduct, thus precluding a finding that the Defendant "either created or supported such retaliatory conduct." (D.I. 217 at 23) (quoting *Kidd v. Commonwealth of Pennsylvania*, 1999 WL 391496 *8 (E.D.Pa. May 20, 1999)). The decision in *Kidd*, however, rested solely on the fact that the alleged retaliation was an isolated incident involving a co-worker, not the plaintiff's supervisor or manager. *Id.* In the present case, ample evidence exists showing management's knowledge of the alleged retaliation. *See DeCesare v. National R.R. Passenger Corp.*, 1999 WL 330258, at *4 (E.D.Pa. May 24, 1999) (holding that an employer is vicariously liable for an employee who was a Title VII victim when the conduct was performed by "a supervisor with immediate (or successively higher) authority over the employee") (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998)).

■ In the instant case, the Plaintiff's confidential reports regarding her initial discrimination charge were improperly placed in her file. She was reassigned to a different work area and placed next to the recipient of the promotion that the Plaintiff was denied. She was also given work assignments for which she had never received training. All of these acts and decisions were not made by co-workers, but by managers. The fact that all of these instances involved managers lends further credence to the inference that most, if not all, of the conduct was condoned by the Defendant.

Furthermore, although some incidents did go unreported, several of them were reported to appropriate personnel. As the Defendant concedes in its brief, the Plaintiff did explicitly complain, on separate occasions, to her manager, Lynn Casper, and to Latonya Dixon in the Human Resources Department. (D.I. 221 at 9–10). Contrary to the Defendant's assertions, little meaningful remedial action was taken upon the Plaintiff's complaints. For instance, Ms. Casper testified that she merely spoke to Mr. Rossiter (the person whose conduct caused the Plaintiff to complain to Ms. Casper) about the Plaintiff's grievance. (D.I. 210 at C–96/5 – C–97/20). In fact, Ms. Casper's testimony indicates that Mr. Rossiter reacted defensively and "aggressive[ly]," but that nothing else was done to remedy the problem (D.I. 210 at C–97/9–12). Regardless of whether these individuals did take remedial action to rectify the problem, their knowledge of the problem reflects the Plaintiff's attempt to directly communicate the retaliation to the Defendant. The fact that other instances of misconduct continued after the Plaintiff reported these incidents is sufficient for a finding that the Defendant knew of the retaliation and allowed it to continue.

### B. Section 1981 Retaliation Claim

#### 1. Retaliation Claims are Cognizable Under Section 1981

The Defendant asserts that it is entitled to a judgment as a matter of law on the Plaintiff's Section 1981 retaliation claim because such claim does not exist under Section 1981. (D.I. 217 at 24). This claim is flawed for both procedural and substantive reasons. Under Federal Rule of Civil Procedure 50(b): "[a] post-trial motion for summary judgment [under Rule 50(b) ] can be granted *only* on grounds advanced

in the pre-verdict motion [under Rule 50(a) ]." FED.R.CIV.P. 50 (advisory committee notes to the 1991 amendment) (citing *Kutner Buick, Inc. v. American Motors Corp.*, 868 F.2d 614 (3d Cir.1989)). The Defendant concedes that this issue was not presented previously, but asserts that strict adherence to the requirements of the Rule are not warranted here because the purpose of the rule is merely to "afford the party against whom the motion is directed an opportunity to cure the possible defects in proof which otherwise might make its case legally sufficient." (D.I. 221 at 10–11) (citing *Lightning Lube v. Witco Corp.*, 4 F.3d 1153, 1173 (3d Cir.1993)). Since the existence of a retaliation claim under Section 1981 is a purely legal question, the Defendant argues, strict adherence to the requirements of Rule 50(b) is not warranted. (D.I. 221 at 11).

The Defendant fails to cite any cases, however, that would allow it to pursue its Rule 50(b) motion under similar circumstances. The Defendant had numerous occasions to present this argument. As the Defendant admits, the question is legal, not factual, in nature. Thus, it should have been raised in a Rule 12(b)(6) motion to dismiss, a Rule 56 motion for summary judgment, or at the very least, a Rule 50(a) motion for judgment as a matter of law. To allow the Defendant to raise this argument for the first time after the jury has rendered a verdict would be to ignore the rules of civil procedure that have been put in place for purposes of judicial economy. *New Castle County v. Hartford Accident & Indem. Co.*, 970 F.2d 1267, 1270 n. 1 (3d Cir.1992); *Goulianos v. Ramapo College of N.J.*, 1986 WL 7649, at *16 (D.N.J. July 8, 1986).

■ The Defendant's argument that a retaliation claim under Section 1981 does not exist also fails for substantive reasons. The Third Circuit recently reversed a district court's dismissal of the plaintiff's Section 1981 retaliation claim. *See Anjelino v. New York Times Co.*, 200 F.3d 73, 98 (3d Cir.1999). Although not explicitly ad-

dressing the issue presented here, it indicates the Third Circuit's willingness to recognize such a claim. The Defendant cites *Revis v. Slocomb Industries, Inc.*, 765 F.Supp. 1212, 1214 (D.Del.1991) to support its argument that Section 1981 does not provide a retaliation cause of action. (D.I. 221 at 24). That case, however, was decided prior to the enactment of the Civil Rights Act of 1991. In analyzing this Act, the Second Circuit stated:

> Legislative history supports the view that this definition was intended to encompass both a race-based failure to promote and retaliation for a complaint of such a failure to promote:
>
>> The Committee intends this provision to bar all race discrimination in contractual relations. The list set forth in subsection (b) is intended to be illustrative rather than exhaustive. In the context of employment discrimination, for example, this would include, but not be limited to, claims of harassment, discharge, demotion, promotion, transfer, *retaliation*, and hiring.
>
> H.R.Rep. No. 102–40(I), at 92 (1991), reprinted in 1991 U.S.C.C.A.N. 549, 630 (emphasis added).

*Hawkins v. 1115 Legal Serv. Care*, 163 F.3d 684, 693 (2d Cir.1998). In accordance with the legislative history of the Civil Rights Act of 1991 and a growing number of circuit court decisions, it is clear that a retaliation claim under Section 1981 is maintainable. *See Andrews v. Lakeshore Rehabilitation Hosp.*, 140 F.3d 1405, 1412–13 (11th Cir.1998); *Barge v. Anheuser-Busch, Inc.*, 87 F.3d 256, 259 (8th Cir. 1996); *Thomas v. Exxon, U.S.A.*, 943 F.Supp. 751, 762–63 (S.D.Tex.1996), *aff'd*, 122 F.3d 1067 (5th Cir.1997).

The Defendant next asserts that even if a retaliation claim is cognizable under Section 1981, the Plaintiff cannot maintain such a suit in the present case because "there is no indication that any action was taken against her because of her race." (D.I. 217 at 24–25) (citations omitted). This argument is illogical—retaliation is not taken on account of one's race; rather,

it is taken in response to a plaintiff's protected activity. Since the Plaintiff had filed a charge of race discrimination against the Defendant with the DDOL and the EEOC and the Plaintiff alleges retaliation in response to that charge, the Plaintiff's retaliation claim squarely falls within the confines of Section 1981.

■ Lastly, the Defendant argues that because the Plaintiff was an at-will employee, she is barred from maintaining a Section 1981 claim. (D.I. 217 at 25). It is clear, however, that Section 1981 protects at-will employees from discrimination and retaliation in states where at-will employees are granted contract rights as a matter of law. *See Marquess v. City of Philadelphia*, 1998 WL 355519, at *3 (E.D.Pa. June 29, 1998). *See also Lauture v. International Bus. Machs. Corp.*, 216 F.3d 258, 259–60 (2d Cir.2000) (holding that at-will employees can maintain claims under Section 1981, and noting that the Fourth, Fifth, and Tenth Circuits have all held similarly within the last two years) (citations omitted). The cases cited by the Defendant (that are still valid [3]) that have held at-will employees cannot maintain claims under Section 1981 have been based on state law grounds. *See, e.g., Jones v. Becker Group, Inc.*, 38 F.Supp.2d 793, 796 (E.D.Mo.1999), *aff'd*, 205 F.3d 1346 (8th Cir.1999). The Delaware Supreme Court has recognized that "statutorily prohibited discrimination" is an exception to the state's doctrine that at-will employees can be terminated for any reason. *Lord v. Souder*, 748 A.2d 393, 399–400 (Del.2000). As a result, the Defendant's argument is without merit.

### 2. The Plaintiff has Established a *Prima Facie* Case of Retaliation and has Proved the Defendant's Proffered Reasons for its Actions were a Pretext for Retaliation

The Defendant asserts that, for the same reasons as discussed in Part A, the Plaintiff failed to establish a *prima facie* case of retaliation and that the Plaintiff failed to show the Defendant's proffered explanations for its conduct were a mere pretext for retaliation. (D.I. 217 at 25). The Defendant asserts that it is therefore entitled to a judgment as a matter of law. (D.I. 217 at 25). Section 1981 claims are analyzed under the same framework as Title VII claims. *See, e.g., Cuffy v. Texaco Refining & Marketing Co.*, 684 F.Supp. 87, 94 n. 7 (D.Del.1988). For the same reasons as discussed above regarding the Title VII claim, the evidence is sufficient to support the jury verdict in favor of the Plaintiff. As a result, the Defendant's Motion for Summary Judgment is denied.

### C. Punitive Damages

The Defendant argues that it is entitled to judgment as a matter of law on the Plaintiff's claim for punitive damages because the Plaintiff has failed to show that the Defendant acted with "malice or reckless indifference to [her] federally protected rights." (D.I. 217 at 26) (citing *Kolstad v. American Dental Ass'n*, 527 U.S. 526, 119 S.Ct. 2118, 2124, 144 L.Ed.2d 494 (1999)). Although the Defendant failed to assert that it is entitled to a judgment as a matter of law on the Plaintiff's punitive damages claim in its Rule 50(a) motion, courts have held that such an omission is not fatal when the Rule 50(a) motion did seek judgment as a matter of law due to insufficient evidence. *Browning v. President Riverboat Casino–Mo., Inc.*, 139 F.3d 631, 636 (8th Cir.1998); *Jarvis v. Sauer Sundstrand Co.*, 116 F.3d 321, 323 n. 4 (8th Cir.1997). In federal discrimination claims, however, the analysis is slightly different. The United States Supreme Court has held that Title VII has two separate standards for liability: "one for establishing a right to compensatory dam-

---

**3.** Defendant relies on *Moorer v. Grumman Aerospace Corp.*, 964 F.Supp. 665, (E.D.N.Y. 1997) to support its argument. *Moorer, how*ever, was expressly overruled in *Lauture*, 216 F.3d at 259–60.

ages and another, higher standard ... to qualify for a punitive award." *Kolstad,* 119 S.Ct. at 2124. Punitive damages are not necessarily warranted upon a finding of intentional discrimination: the employer must have "knowledge that it may be acting in violation of federal law," not mere knowledge that it is unlawfully retaliating. *Id.* at 2124.

Since the punitive damages analysis is slightly different than the compensatory damages analysis, it is not clear that a Rule 50(a) motion challenging the sufficiency of the evidence serves to put the Plaintiff on notice of the punitive damages challenge, because different facts need to be proven. *See Alexander v. Riga,* 208 F.3d 419, 434 (3d Cir.2000) (remanding discrimination case on the issue of employer's vicarious liability for punitive damages because it involves a different factual analysis than determining vicarious liability for compensatory damages). Without deciding the issue of whether the Defendant waived the punitive damages argument, the Court dismisses the argument on substantive grounds.

■ In order to recover punitive damages under a Title VII claim,[4] the plaintiff must show that the defendant acted "with malice or with reckless indifference to the federally protected rights of [the plaintiff]." *Kolstad,* 119 S.Ct. at 2124. The United States Supreme Court emphasized that intentional discrimination or retaliation, by itself, is not enough to assess punitive damages; rather, the defendant must have been at least recklessly indifferent to the fact that the plaintiff's federal rights were being violated. *Id.* Therefore, an employer who intentionally engaged in conduct that violated federal discrimination laws, but was unaware that her conduct violated any laws, would not be liable for punitive damages. *Id.* at 2125. The conduct need not be egregious, however; if the employer was acting "in the face of a

perceived risk that its actions [would] violate federal law," punitive damages are warranted. *Id.* The Third Circuit has also recognized that, since most employers know that discrimination on the basis of race or gender is prohibited by federal law, courts should presume such knowledge unless the employer affirmatively proves ignorance. *Alexander,* 208 F.3d at 432 (denying the defendant's argument that punitive damages were not warranted because "there [was] not any suggestion that [the defendant] did not know that it was illegal, and had been for thirty years, to discriminate on the basis of race"). Furthermore, circumstantial evidence, by itself, can support an award of punitive damages. *See Herbert v. Lando,* 441 U.S. 153, 162 n. 7, 99 S.Ct. 1635, 60 L.Ed.2d 115 (1979).

■ Applying the above standard, the Court concludes that the Plaintiff presented sufficient evidence to support the assessment of punitive damages. The most glaring instance of the Defendant's conduct was the placement of reports detailing the Plaintiff's original discrimination charge in her personnel file, which was subsequently seen by at least four managers. The Plaintiff also testified that she received public criticism for non-existent mistakes in her work, was isolated by managers, ignored by her peers and subordinates, was switched to an inferior cubicle next to the recipient of the promotion that she was denied, and was requested to complete tasks that her manager knew she was unqualified to complete. All of this, taken together, is sufficient circumstantial evidence to establish that the Defendant possessed the requisite state of mind for the assessment of punitive damages.

The Defendant argues, however, that it is inappropriate to hold it vicariously liable for acts of its employees when those acts were " 'contrary to the employer's good

---

4. Or any federal discrimination claim. *See Alexander,* 208 F.3d at 430–31 (extending *Kol-* *stad* to apply to any federal civil rights claim).

faith efforts' to comply with Title VII." (D.I. 217 at 26) (quoting *Kolstad,* 119 S.Ct. at 2129). This is true, the Defendant urges, especially when much of the retaliatory conduct was performed by the Plaintiff's peers or subordinates. (D.I. 221 at 13). The Supreme Court has made it clear, however, that an employer can be held vicariously liable, even under a punitive damage theory, for the acts of employees other than "top management, officers, or directors." *Kolstad,* 119 S.Ct. at 2128. In the present case, the record contains sufficient evidence to support the conclusion that the Defendant did not put forth its best efforts to root out the on-going retaliatory conduct. All of the previously discussed evidence, especially the placement of reports detailing the Plaintiff's original discrimination charge, allows for a finding that all of the conduct was instigated or supported by the Defendant. Therefore, the Defendant's motion for judgment as a matter of law as to the punitive damages award is denied.

## II. DEFENDANT'S MOTION FOR A NEW TRIAL

The Defendant also argues that it is entitled to a new trial because: (1) there were several improper jury instructions, (2) the Plaintiff wilfully violated the Court's order prohibiting the introduction of evidence on the Delaware Department of Labor's investigation, and (3) the jury's verdict is against the great weight of the evidence.

Under Rule 59 of the Federal Rules of Civil Procedure, "[a] new trial may be granted to all or any of the parties on all or part of the issues ... in an action in which there has been a trial by jury, for any of the reasons for which new trials have been granted at law in the courts of the United States." FED.R.CIV.P. 59(a). The language of the rule means that "[t]he authority to grant a new trial ... is confided almost entirely to the exercise of discretion on the part of the trial court." *Allied*

*Chem. Corp. v. Daiflon, Inc.,* 449 U.S. 33, 36, 101 S.Ct. 188, 66 L.Ed.2d 193 (1980).

### A. Jury Instructions

█ When evaluating a motion for a new trial due to an alleged legal error in the jury instructions, the court must determine "(1) whether an error was in fact committed, and (2) whether that error was so prejudicial that denial of a new trial would be inconsistent with substantial justice." *Finch v. Hercules,* 941 F.Supp. 1395, 1413 (D.Del.1996). In doing so, the court should examine the jury instructions as a whole, not just specific provisions in isolation. *See Mycogen v. Monsanto Co.,* 61 F.Supp.2d 199, 264 (D.Del.1999).

### 1. Definition of "Adverse Employment Action"

The Defendant first claims that the Court erred in its instruction to the jury regarding the legal definition of "adverse employment action." (D.I. 217 at 28). It argues that "adverse employment action" has a precise, "narrow," legal definition that should have been explained to the jury in detail. (D.I. 217 at 28). The Defendant misconstrues the law in so arguing. *See Aiello v. Reno,* 2000 WL 635442, at *5–6 (N.D.Cal. May 16, 2000) (noting the disagreement among the circuit courts regarding the definition of "adverse employment action"). The Third Circuit has declared that, even if conduct falls short of actual termination, if it "adversely affects [the plaintiff's] status as an employee," it is deemed an "adverse employment action." *Robinson v. City of Pittsburgh,* 120 F.3d 1286, 1300 (3d Cir.1997).

█ The Court fails to see how explaining that "adverse employment action" is something that adversely affects one's employment status could have been helpful to the jury. The Defendant does not cite to, and the Court cannot find, any cases that were reversed because of a failure to define the term "adverse employment action" in the manner the Defendant urges was required. Interestingly, the Defen-

dant relies on *Moore v. Southeastern Pa. Transp. Auth.* to support its argument that the Court should have defined "adverse employment action" in more detail. (D.I. 221 at 14–15). In *Moore*, the court defined "adverse employment action" as "actions which have a *negative impact upon employment*, such as discharge, demotion, a pay reduction or *other impairment to employment*." 1998 WL 633659, at *3 (E.D.Pa. Aug. 26, 1998) (emphasis added). Again, it is unclear how a definition containing the ambiguous phrases "negative impact upon employment" and "other impairment to employment" could have been any more clear than the phrase "adverse employment action." Thus, even if failing to define "adverse employment action" in more detail was error, the Defendant is still not entitled to a new trial because the error was clearly harmless.

### 2. Burden of Proof in a Retaliation Claim

The Defendant also argues that it is entitled to a new trial because the jury was not properly instructed regarding the Plaintiff's burden of proof in her retaliation claim. (D.I. 217 at 29). Under the *McDonnell Douglas* burden shifting framework that is used to decide retaliation claims under Title VII and Section 1981, there are three discrete steps to the analysis: (1) the plaintiff must establish a *prima facie* case of retaliation, (2) the defendant must then "articulate some legitimate, nondiscriminatory reason" for its actions to rebut the presumption that it has retaliated, and (3) if the defendant succeeds in step (2), the presumption drops from the case and the plaintiff must then "convince the factfinder 'both that the reason was false, and that discrimination was the real reason [for the defendant's actions].'" *Woodson v. Scott Paper Co.,* 109 F.3d 913, 920, 920 n. 2 (3d Cir.1997) (citations omitted). The Defendant asserts that the jury instruction regarding this burden shifting was improper. (D.I. 217 at 30).

The Court instructed the jury as follows:

> If you find that [the Plaintiff] has [established a *prima facie* case], you must then decide whether [the Defendant] has met its burden of demonstrating some legitimate nonretaliatory reason for their actions. [The Defendant] must come forward with evidence that establishes that their actions were not motivated by retaliatory intent. If [the Defendant] meets that burden, you must then determine whether [the Defendant's] stated reason for their actions is a mere pretext or cover-up for unlawful retaliation.

(D.I. 197 at 18). The Defendant first argues that this instruction failed to adequately inform the jury that in the second step of the analysis, the Defendant's burden of production is "relatively light." (D.I. 217 at 30) (citations omitted). The Defendant misconstrues the purpose of the *McDonnell Douglas* framework in advancing this argument. *See White v. New Hampshire Dept. of Corrections,* 221 F.3d 254, 264 (1st Cir.2000) (stating that jury instructions do not have to "follow the exact regimen" of the *McDonnell Douglas* framework, as it was not intended to be a model jury instruction). If the Court had granted the Plaintiff a judgment as a matter of law because the Defendant had failed to satisfy the second step of the analysis, without noting the "relatively light" burden at this stage, perhaps a new trial would be warranted. However, the ultimate decision for the jury to make is whether they believe the Defendant's proffered explanation and whether they conclude by a preponderance of the evidence that the Defendant did engage in retaliation. Whether the jury dismissed the Defendant's proffered reasons after step two or step three in the analysis is irrelevant. Moreover, the evidence presented at trial shows that the Defendant clearly did articulate "some" nondiscriminatory purpose for its conduct, and therefore, easily satisfied step two. Thus, the question the jury

had to determine was one of credibility, of which the jury was properly instructed.

The Defendant also argues that the instructions failed to inform the jury that the Plaintiff had to prove both (1) that the Defendant's "proffered reasons for its actions were false," and (2) "that retaliation was the real reason for [the Defendant's] actions." (D.I. 217 at 30). The Defendant argues that because the jury instruction only asked the jury to determine if the proffered reason for the action "is a pretext or cover-up for unlawful retaliation," it misstated the law as articulated by the Supreme Court and the Third Circuit Court of Appeals. (D.I. 217 at 30).

In *St. Mary's Honor Center v. Hicks*, the United States Supreme Court explicitly stated that, to win a discrimination or retaliation claim under step three of the *McDonnell Douglas* framework, the plaintiff must prove that the defendant's proffered reasons were false *and* that retaliation was the actual reason for the defendant's conduct. 509 U.S. 502, 511, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). *See also Blackburn v. United Parcel Serv., Inc.*, 179 F.3d 81, 92–93 (3d Cir.1999) (same). In *Hicks*, the Supreme Court reversed the district court's granting of summary judgment for the plaintiff after the plaintiff had successfully shown that the defendant's proffered reasons were a mere pretext. 509 U.S. at 511, 113 S.Ct. 2742. The Supreme Court emphasized that, if the plaintiff is not further required to prove retaliation was the actual reason for the defendant's conduct, the burden of proof would effectively be shifted onto the defendant. *Id.*

In the present case, the Defendant's argument fails primarily because the jury instruction did in fact require the jury to find that retaliation was the actual reason. Although the instruction did not present the issue in two separate steps, the instruction clearly stated that, for the Plaintiff to win, the jury had to conclude that the Defendant's actions were "a mere pretext or cover-up *for unlawful retaliation*."

(D.I. 197 at 18) (emphasis added). This instruction clearly informs the jury that unlawful retaliation must be the actual reason for the Defendant's conduct.

 Moreover, *Hicks* is distinguishable from the instant case. *Hicks* involved the granting of summary judgment, whereas in this case, the ultimate factual question was sent to the jury. *See White*, 221 F.3d at 264 ("[t]he central issue [in claims utilizing the *McDonnell Douglas* framework], which the court must put directly to the jury, is whether or not plaintiff was discharged [or retaliated against] 'because of [protected conduct]' "). Furthermore, jury instructions are to be read as a whole, rather than as individual sentences or paragraphs, to determine if they are misleading. *Mycogen Plant Science, Inc. v. Monsanto Co.*, 61 F.Supp.2d 199, 264 (D.Del.1999). In the present case, the Court instructed the jury that "[t]his is a civil case. [The Plaintiff] has the burden of proving her claims and damages by what is called a preponderance of the evidence." (D.I. 197 at 12). Since the jury instructions contained an accurate description of the *McDonnell Douglas* framework (although not in the exact language the Defendant desired), and it contained an explicit instruction that the Plaintiff had the burden to prove all of its claims by a preponderance of the evidence, the instructions were sufficient. *See, e.g., White*, 221 F.3d at 264–65 (holding that a jury instruction that did not clearly describe the *McDonnell Douglas* burden shifting framework was adequate, especially considering the separate jury instruction emphasizing that the plaintiff always has the ultimate burden of proof).

### 3. The Plaintiff's Failure to Complain

The Defendant also argues that it is entitled to a new trial because the jury instructions failed to adequately instruct the jury regarding the effect of the Plaintiff's failure to complain about the alleged conduct. (D.I. 217 at 31) (citing *Burling-*

*ton Indus., Inc. v. Ellerth.*, 524 U.S. 742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998)). As discussed above, the Plaintiff is not required to complain to the Defendant about retaliatory conduct when there is ample circumstantial evidence suggesting that the Defendant's management supported or encouraged the conduct. Also, the Plaintiff did report specific instances of retaliatory conduct on two separate occasions. Therefore, the Defendant's argument lacks merit.

## B. The Plaintiff's Wilful Violation of the Court's Order

■ The Defendant also asserts that it is entitled to a new trial because the Plaintiff "deliberately violated [the] Court's *in limine* order prohibiting introduction of evidence of the [Delaware Department of Labor] determination." (D.I. 217 at 16). In deciding whether to grant a new trial due to party misconduct, the court should only do so if it is "reasonably probable that the verdict was influenced by prejudicial statements." *Greenleaf v. Garlock, Inc.*, 174 F.3d 352, 363–64 (3d Cir.1999).

■ In response to a question from her attorney regarding any promotions that she had received from the Defendant, the Plaintiff testified: "[i]nterestingly, I did receive a promotion, after a year when the Labor Department did an investigation, and validated that there was reason to believe that—" (D.I. 208 at A–81/1–3). The Defendant's counsel, however, interrupted the Plaintiff before she said anything revealing about the DDOL's findings. (D.I. 208 at A–81/4–5). The second instance, which occurred two days later,[5] was even more innocuous. In responding to another question about promotions, the Plaintiff stated: "[y]es. I did receive a promotion on the basis of a conciliation." (D.I. 207 at B–13/3–4). Again, the Defendant objected before the Plaintiff said anything further on the matter.

5. The Defendant is correct in stating that the next violation occurred "the very next day of trial." (D.I. 217 at 32). This statement is

It is true that these statements were made in violation of the Court's order and the second instance occurred after an express in-court warning not to discuss the DDOL investigation. The statements, however, revealed nothing that damaged the Defendant's case. In the first instance, the Plaintiff was interrupted before she could announce what the DDOL's findings actually were. In the second instance, the brief reference to a "conciliation," when viewed from the jury's perspective, is unlikely to have affected their impression regarding the DDOL investigation. Quite possibly, they might not have even known to what the Plaintiff was referring. As a result, the two isolated incidents—within the context of a three day trial—were harmless.

## C. Verdict Against the Great Weight of the Evidence

■ The Defendant further argues that it is entitled to a new trial because the verdict in favor of the Plaintiff's retaliation claim is against the great weight of the evidence. (D.I. 217 at 34). A Court is only to grant a new trial because the verdict is against the great weight of the evidence "if it is quite clear that the jury has reached a seriously erroneous result." *Garrison v. Mollers N. Am., Inc.*, 820 F.Supp. 814, 821 (D.Del.1993). As discussed in detail above, sufficient evidence exists to support the jury's verdict. It is not clear that the verdict was "seriously erroneous." Contrary to the Defendant's assertions, the case law does not suggest that a verdict in favor of the Defendant on the Plaintiff's constructive discharge claim warrants a verdict in the Defendant's favor on the Plaintiff's retaliation claim. *See Robinson*, 120 F.3d at 1300. Therefore, the Defendant's motion is denied.

## III. DEFENDANT'S MOTION FOR AN AMENDMENT OF THE VERDICT

The Defendant argues that it is entitled to an amendment of the verdict because (1)

misleading, however, because the trial did not reconvene until two days later.

the compensatory and punitive damage awards were clearly excessive, thus warranting a reduction, and (2) total damages should be reduced to $300,000, to conform with the statutory maximum under Title VII.

■ A court should order a remittitur reducing the amount of damages only when, in its sole discretion, the court believes that the damage award "exceed[s] any rational appraisal or estimate of the damages that could be based upon the evidence before the jury." *Starceski v. Westinghouse Elec. Corp.*, 54 F.3d 1089, 1101 (3d Cir.1995) (citations omitted).

## A. Compensatory Damages

■ The Defendant argues that $100,000 in compensatory damages was clearly excessive because the Plaintiff suffered no economic loss from the retaliation. (D.I. 217 at 35). The Defendant claims that the only evidence of any harm suffered by the Plaintiff is "her subjective claims that she suffered headaches and an upset stomach." (D.I. 217 at 35). In support of this argument, the Defendant analogizes this case to those where "the evidence of pain and suffering was so scanty that it could not support a verdict." (D.I. 221 at 17–18). The Defendant concedes, however, that the Plaintiff had seen "her family doctor, a therapist, and a psychiatrist" in an attempt to deal with the anguish caused by the retaliatory conduct that persisted for approximately two years. (D.I. 217 at 35). Such evidence supports a verdict awarding $100,000 in compensatory damages. *See, e.g., Bolden v. Southeastern Pa. Transp. Auth.*, 21 F.3d 29 (3d Cir.1994).

## B. Punitive Damages

The Defendant also asserts that a remittitur is warranted because the punitive damage award of $500,000 is clearly excessive. (D.I. 217 at 37). More specifically, the Defendant urges the Court to reduce the punitive damage award because its conduct was not "reprehensible," but was relatively minor. (D.I. 217 at 37).

The United States Supreme Court has articulated a three-pronged analysis for analyzing the appropriateness of the amount of punitive damages: (1) "the degree of reprehensibility of the defendant's [conduct]"; (2) "the disparity between the harm or the potential harm suffered ... and [the] punitive damages award"; and (3) "the difference between [the punitive damages award] and the civil penalties authorized or imposed in comparable cases." *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 574–75, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996).

■ In applying this standard to the present case, the Court finds that the Plaintiff offered some evidence to conclude that the Defendant intentionally retaliated against the Plaintiff for filing her original discrimination charge, and knew that this was a violation of the Plaintiff's federal rights. Although this could arguably support a conclusion that the Defendant's conduct was "reprehensible" to some degree, the Court finds that the evidence barely exceeds the threshold level warranted for the assessment of punitive damages. No direct evidence exists to support a finding of reprehensible conduct on the part of the Defendant; rather, all the evidence requires the factfinder to draw inferences regarding the Defendant's knowledge of the retaliation. In most cases, the Defendant did not engage in any of the retaliation, but merely permitted the retaliation to continue. As a result, the Court concludes that the degree of reprehensibility of the Defendant's conduct was relatively low.

In assessing the second prong, the jury's verdict provided for a 5:1 ratio between punitive and compensatory damages. The Court finds that such a 5:1 ratio is not grossly disproportionate as a matter of law. *See TXO Prod. Corp. v. Alliance Resources Corp.*, 509 U.S. 443, 471–72, 113 S.Ct. 2711, 125 L.Ed.2d 366 (1993). But, under the facts of this case, the Court does

**790**

find that such a ratio is inordinately disparate because the Defendant's conduct was not very reprehensible.

The third prong of the analysis also tilts in favor of the Defendant. Some discrimination and retaliation cases have authorized verdicts in amounts comparable to the $500,000 of punitive damages assessed in this case. *See, e.g., Kimzey v. Wal-Mart Stores, Inc.,* 107 F.3d 568 (8th Cir. 1997) (upholding $350,000 in punitive damages for a sexual harassment claim that yielded only $35,000 in compensatory damages); *Cush–Crawford v. Adchem Corp.,* 94 F.Supp.2d 294, 298–99 (E.D.N.Y.2000) (upholding $100,000 in punitive damages in a Title VII claim in which the plaintiff received no compensatory damages). Those cases, however, emphasized that punitive damages are most appropriate where the defendant actively participated in the retaliatory conduct. *See Kimzey,* 107 F.3d at 575. Since the Defendant in the present case had very little active involvement in the retaliation, this factor provides support for a reduction of the punitive damages.

In balancing these factors, the Court believes reducing the amount of punitive damages is warranted. The Defendant's conduct was passive, not active, and can barely be considered reprehensible. As a result, the Court will reduce the jury's punitive damages award from $500,000 to $100,000, a figure it believes is appropriate to adequately punish the Defendant.

### C. $300,000 Statutory Limit on Damages Under Title VII

The Defendant next argues that the jury verdict should be reduced to $300,000, in order to comply with the statutory maximum under Title VII for companies equivalent to the size of the Defendant. (D.I. 217 at 38–39) (citing 42 U.S.C. § 1981a(b)(3)(D)). As discussed above, the Court has reduced the punitive damages award to $100,000, making the total damages assessed against the Defendant amount to $200,000. As a result, this argument is now moot.

### CONCLUSION

Therefore, for the reasons discussed, the Court will deny the Defendant's motion as to the Judgment as a Matter of Law and New Trial, but will grant in part the Defendant's Motion for Amendment of the Verdict by reducing the punitive damages award to $100,000. (D.I.214).

An appropriate Amended Order will be entered.